IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JUDE R. GONZALES,

      Plaintiff,

v.                                                                No. IV 11-1087 LFG

MICHAEL S. ASTRUE, Commissioner
of the Social Security Administration,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff Jude R. Gonzales's ("Gonzales") Motion to Reverse or Remand 1Administrative Agency Decision, filed May 7, 2012. [Docs. 15, 16.] The Commissioner of Social Security issued a final decision denying benefits, finding that Gonzales was not entitled to disability insurance benefits ("DIB"). The Commissioner filed a response to Gonzales's motion [Doc. 17], and Gonzales filed a reply [Doc. 18]. Having considered the pleadings submitted by the parties, the administrative record and the applicable law, the Court denies the motion to reverse or remand for the reasons stated below.

## I.       PROCEDURAL BACKGROUND

On May 6, 2008, Gonzales applied for DIB [AR 13, 104], alleging that he was disabled since February 15, 2008, due to arthritis in his knees, diabetes, hearing loss in his right ear, memory loss, and synovitis.[1] [AR 51, 104, 128.] Gonzales's DIB application was denied at the initial and

---

    [1]"Synovitis is the medical term for inflammation of the synovial membrane. This membrane lines joints which possess cavities, known as synovial joints. The condition is usually painful, particularly when the joint is moved. The joint usually swells due to synovial fluid collection." http://en.wikipedia.org/wiki/Synovitis (7/20/2012.)

reconsideration levels.  [AR 47, 51, 56.]  On January 26, 2010, an ALJ in Texas conducted an administrative hearing by video conference.  Gonzales and his counsel appeared in Santa Fe, while the ALJ and the vocational expert ("VE") were located in Fort Worth.[2] [AR 25-46.]  On February 22, 2010, the ALJ issued a decision finding Gonzales was not disabled and denying his application for DIB.  [AR 10-21.] On March 18, 2010, Gonzales filed a request for review and submitted an attorney's letter in support of his request. [AR 8, 180.]  On November 7, 2011, the Appeals Council denied the request for review. [AR 1-6.]  On December 9, 2011, Gonzales filed a Complaint for court review of the ALJ's decision. [Doc. 1.]

Gonzales was born on December 4, 1952, and was 57 years old at the time of the ALJ hearing.  [AR 29, 104.] He was educated in parochial schools in Santa Fe through high school. [AR 192.]  In 1977, he obtained his Bachelor's Degree in business administration. [AR 30.] After completing college, Gonzales worked for the State of New Mexico in various capacities.  He worked at the Department of Finance for seven years, with the Department of Game and Fish for sixteen years, and as Director of Finance and Accounting with the Highway Department for four years. [AR 129, 192.] From about 2003 or 2004 to 2008, Gonzales worked part-time as a legislative analyst for different legislators during the legislative sessions. [AR 192.] [*See also* AR 136.][3]

---

[2]On April 28, 2009, the Social Security Administration transferred Gonzales's request for hearing to Texas "because of temporary area realignment to expedite hearing decision." [AR 67.]

[3]On his work history report, Gonzales noted that he was a senior analyst for the House Majority from January to February 2008, just prior to his alleged disability onset date of February 15, 2008. [AR 136.] This disability form also indicates he worked as a senior legislative analyst from August 1977 to December 2003. [AR 136.] For some reason, this form provides somewhat different work history than what Gonzales described to a disability examining physician on July 16, 2008. [AR 192.] On the work history forms, Gonzales describes having worked as an analyst in different capacities for over 30 years.

Gonzales has been married for thirty years and lives in a two-story house.  [AR 29, 192.] Gonzales has two grown children. [AR 193.] He is close to six feet tall and weighs around 210 pounds. [AR 30.]

Gonzales's earning records indicate that in 1979, he earned approximately $12,000; from 1980 to 1983, his earnings ranged from $13,000 to $18,000; from 1984 to 1987, he earned between $20,000 and $22,000; from 1989 to 1998, his earnings ranged from $41,000 to $46,000; in 1999, he earned $21,000, and $34,000 in 2001.  In 2001, Gonzales earned $66,000, and in 2002 - 2003, he earned in the low to mid $50,000 range.  [AR 112-13.] He explained that some variations in his earnings were due to being laid off in 1999, a settlement he received from an injury in 2001 or 2002, and changes in jobs in 2004 and 2006. [AR 105.]

## II.    STANDARDS FOR DETERMINING DISABILITY

In determining disability, the Commissioner applies a five-step sequential evaluation process.[4]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[5]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[6] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits [his] physical or mental ability to do basic work activities . . . .;"[7] at step three,

---

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[5]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[6]20 C.F.R. § 404.1520(b) (1999).

[7]20 C.F.R. § 404.1520(c) (1999).

the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[8] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[9]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[10] age, education and past work experience, he is capable of performing other work.[11]

Here, the ALJ made a detailed RFC determination that included a finding that Gonzales could occasionally lift or carry up to 20 pounds, over a sustained period, and frequently lift or carry 10 pounds.  He could sit for about 6 hours and stand or walk for at least 2-4 hours, and periodically alternate by sitting and standing to relieve pain or discomfort. [AR 16.] At step four, the ALJ determined that Gonzales's RFC did not prevent him from performing his past relevant work.

## III.   STANDARD OF REVIEW

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and

---

[8]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[9]20 C.F.R. § 404.1520(e) (1999).

[10]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[11]20 C.F.R. § 404.1520(f) (1999).

sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).  A decision is not based on substantial evidence "if it is overwhelmed by other evidence in the record."  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009) (internal quotation marks omitted).

The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards.  Hamlin, 365 F.3d at 1214.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

## IV.   ALJ'S FINDINGS

In denying Gonzales's DIB application, the ALJ found that Gonzales had not engaged in substantial gainful activity subsequent to the alleged onset date of February 15, 2008.  The ALJ observed that while Gonzales stated he last worked in February 2008, there are notations in the record indicating his job did not end due to disability.  For example, an October 2008 record indicated Gonzales as being "retired." [AR 15.]

The ALJ made the following additional findings: (1) Gonzales had severe impairments of degenerative joint disease of the knees, flexion tendon contractions of the right ring and middle fingers and diabetes mellitus ("DM") [AR 15]; (2) Gonzales did not have a medically determinable impairment or combination of impairments that met any listings; (3) Gonzales had the following RFC:

> The claimant retains the RFC, over a sustained period of time, to occasionally lift and/or carry (including upward pulling) 20 pounds, frequently lift and /or carry (including upward pulling) 10 pounds, stand and/or walk for at least 2-4 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday, periodically alternating sitting and standing to relieve pain or discomfort; further limited by only occasional pushing and/pulling [sic] 20 pounds with the lower extremities; no climbing ladders, ropes, or scaffolds; only occasional balancing, kneeling, crouching, crawling, or stooping; and no work around hazardous moving machinery, excessive vibration, or unprotected heights; but capable of frequent climbing of ramps and stairs; frequent reaching, handling, fingering, and feeling with the right hand/arm; and constant reaching, handling, fingering, and feeling with the left hand/arm; with no visual/communicative limitations; and with the ability to sustain work mentally, *e.g.,* understand, remember, and carry out detailed/complex instructions and make judgments on detailed/complex work-related decision (*See* SSR 85-15).

[AR 16.] At step four, the ALJ determined Gonzales could perform his past relevant work as a legislative senior analyst, as he actually performed the job and as the job "is ordinarily required by

employers throughout the national economy," and that he could perform his past relevant work as a highway department senior analyst as the job "is ordinarily required by employers . . . ." [AR 20.] Thus, the ALJ determined Gonzales was not disabled and not entitled to DIB. [AR 20.]

## V.   MEDICAL HISTORY AND BACKGROUND

Gonzales worked for the State of New Mexico in various capacities from about 1977 until he stopped working in February 2008. [AR 192.] He reported to a disability consultative medical examiner that he was not working for about 13 months between his positions with the Fish and Game Department and Highway Department, when he was either laid off or quit. According to the medical examiner, Gonzales did not wish to discuss that portion of his work history. [AR 192.] It appeared to the examiner that about ten years before the 2008 appointment, Gonzales had encountered a lot of work-related stress and was diagnosed with DM. However, the medical records that are a part of the administrative record begin in 2007.

### *2007 Records*

On June 8, 2007, Gonzales saw an orthopedic specialist, Dr. Steven Weiner, concerning pain in both knees, although he reported he was primarily there for his right knee. He stated that he had an injury a few weeks ago and encountered "giving away episodes, twisting injury to right knee, and

developed pain."   Gonzales already had "left knee video arthroscopic exam for partial meniscectomy,[12] chlondoplasty[13] in 2004."[14]  He complained of increasing pain in the medial aspect of his left knee as well. [AR 260.]  Gonzales reported to Dr. Weiner that his diabetes was "very well controlled."

On exam, Dr. Weiner observed that Gonzales had full extension with the right knee but could not fully flex it.  His knee was stable.  He had "slight varus deformity"[15] in his left knee, which he could neither fully extend nor flex.  The ligaments were stable.  X-rays of both knees indicated "varus deformity" with the left knee being worse than the right.  There were degenerative changes

---

[12]"Partial meniscectomy is partial removal of unstable meniscus, and smoothening of the remaining meniscus edges.  Meniscus is the C-shaped cartilage located in the knee that lubricates the knee joint, controls flexion and extension of joint, acts as shock-absorbers. Partial meniscectomy helps in restoring or maintaining knee stability and offers faster and complete recovery." http://www.drmcchesney.com/knees.html (7/20/2012.)

[13]"Chondroplasty is a surgical procedure of reshaping the joint surface where the roughened and damaged articular cartilage behind the knee cap is cut, shaved and lasered." http://www.drmcchesney.com/knees.html

[14]There are no medical records from the 2004 knee procedure, but a number of medical records or reports mention that procedure.

[15]"In orthopedics, a varus deformity is a term for the inward angulation of the distal segment of a bone or joint. The opposite of varus is called valgus." "... in a varus deformity of the knee, the distal part of the leg below the knee is deviated inward, resulting in a bowlegged appearance. Conversely, a valgus deformity at the knee results in a knock-kneed appearance, with the distal part of the leg deviated outward."  http://en.wikipedia.org/wiki/Varus_deformity (7/20/2012.)

in the left knee.  The right knee showed definite narrowing but no degenerative changes.  Dr. Weiner planned to order an MRI and to give the left knee "viscoelastic injections."[16]  [AR 260.]

A June 26, 2007 follow-up MRI of the right knee showed a medial meniscus tear and degenerative changes.  Dr. Weiner discussed arthroscopy and viscoelastic injections for the left knee. [AR 259.] Although the surgery/procedure records do not appear to be part of the administrative record, Gonzalez must have had a procedure done on his right knee around this time as there is a July 2007 medical record indicating Gonzales had "right knee video arthroscopy" about three weeks ago" and was doing well as of July 25, 2007. [AR 256.]

At this time, Gonzales was also having a series of synvisc injections for his left knee. [AR 257, 258.] On September 17, 2007, Dr. Weiner noted that both knees were doing well but that Gonzales had more degenerative problems with the right knee.  Dr. Weiner suggested synvisc injections for the right knee since they had helped his left knee. [AR 255.] On October 31, 2007, Gonzales still had some discomfort with the right knee, post-arthroscopy, and he wanted to have synvisc injections for the right knee. [AR 254.]

Several of the 2007 medical records include recommendations that Gonzales should exercise more. [AR 235, 238.] In late 2007, Gonzales began receiving synvisc injections in his right knee.

---

[16]"Steroid and viscoelastic supplementation injections are advanced treatment options for patients with arthritis and other sources of joint pain that have not responded well to exercise and oral medications.  These injections deliver relief directly to the source of the pain and are considered safe for nearly all patients."  "Viscoelastic supplementations such as Orthovisc, Euflexxa and Hyalgan are made from hyaluronan, a substance naturally found in healthy joint fluid, to help cushion, protect and lubricate the knee for significant symptom relief.  These injections are administered on a weekly basis and can relieve pain for up to six months, although results may vary depending on the individual and the type of injection."
http://www.princetonorthopaedic.com/procedures/diagnosticnonsurgicalphysiatric/steroid-and-viscoelastic-supplementation-e-g-orthovisc-euflexxa-hyalgan-synvisc/ (7/20/2012.)

In December 2007, Gonzales indicated he might want to have another series of synvisc injections in his left knee as well. [AR 251-253.]

### *2008 Records*

The majority of the 2008 records consist of disability-related forms. The onset date of Gonzales's alleged disabilities is February 15, 2008, although there are no medical records indicating a specific injury or problem on that date. However, Gonzales apparently stopped working as a legislative analyst at that time, or the legislative session ended then.

Gonzales again began receiving synvisc injections in his left knee. [AR 249-250.] As of April 23, 2008, he felt the injections were helping. [AR 248.]

On May 6, 2008, Gonzales filed his application for DIB. [AR 104.] His disability report on that date indicates that although he had worked for the State Legislature since 2004, his job did not end due to a disability. Rather, it was determined to be a temporary job. The disability employee did not comment on any problems during the telephone interview with Gonzales. [AR 123-25.]

In the May 6, 2008 disability report, Gonzales's limiting illnesses were: arthritis in the knees, DM, hearing loss mostly in the right ear, memory loss, and synvisc treatments. [AR 128.] He weighed 235 pounds at that time and claimed to have gained weight due to not being as mobile as before. Gonzales had difficulties walking long or short distances, climbing stairs, or sitting for long periods. He suffered numbness in his left hand if he typed too long. He believed these problems began to interfere with his work in 2004, although he continued to work until February 2008. [AR 128.] During his position with the Highway Department, he described lifting up to 50 pounds and supervising 30 people. [AR 129-30.]

His primary physician, Dr. Berkowitz. first saw Gonzales in 1983, although few records from Dr. Berkowitz were made part of this administrative record. Gonzales had been seeing the

orthopedic specialist since 2004 for his knees.  He had cataracts in both eyes. [AR 131.] He was taking Avandia, Glipizide and Metformin for DM, Ibuprofen for pain and Simvastatin for cholesterol control. [AR 132.]

In a vision screening report, dated June 10, 2008, Gonzales noted vision problems since the age of 10 and that he had cataract surgery in both eyes in 2004.  He could drive, read the newspaper and watch television.  His vision did not interfere with his ability to work. [AR 135.]

In the adult function report, dated June 10, 2008, Gonzales described his day as waking up at 6 a.m., reading the newspaper, having coffee, taking his medications, eating a light breakfast, doing light yardwork, showering, having lunch, watching television, and taking a long nap.  He fed the dog, had dinner, watched more television and went to bed around 9 p.m. [AR 144.] Gonzales helped his wife with her ill mother twice a week by giving her medications and feeding her.  He also fed and groomed pets and other animals. [AR 145.] However, he stated he could not stand too long or walk or run.  He could not ride a horse.  He awoke several times during the night. [AR 145.]

Gonzales did not have any problems with his personal care, but needed some reminders from his wife about medications.  He prepared food one to three times a week, and that preparation took 30-60 minutes.  He could make the bed, do dishes, vacuum, do light housekeeping, water trees and care for the garden.  He performed these tasks 2-4 hours a day, although his wife helped, too.  [AR 146.]

Gonzales went outside every day.  He could drive the car and grocery shop.  His hobbies were hunting, fishing, and horseback riding, but he stated he was not able to walk or ride horses.  He went to sporting events. [AR 148.] Gonzales checked almost all of the boxes on the form,

indicating he had limitations with most activities.  He stated he had arthritis in his right hand[17] and could lift 15-20 pounds.  He could only stand 5-8 minutes.  He was losing the hearing in his left ear. [AR 149.] He did not have problems paying attention or following instructions, and yet he also said he had trouble concentrating which was a large factor in keeping his DM under control.  He used a cane. [AR 150.]

Gonzales's wife, Felicia, filled out a third-party adult function report, dated June 11, 2008. [AR 152.] Felicia worked part-time.  She stated she and her husband did many things together both inside and outside the home.  Gonzales helped her with her mother who has Parkinsons.  He had some trouble dressing and bending his knees to put on his shoes and socks. [AR 153.] He was able to fix dinners and did some cooking.  He tended to eat out for lunch.  He needed her help maintaining the yard. [AR 154.] Felicia described her husband as a "great horseman" who tried to hunt yearly.  He could not ride horses as long as he had before and had to be very careful when walking or climbing stairs.  He talked to his friends and family but stayed home more. [AR 156.] Felicia predicted that vacationing would be a problem because he would have trouble keeping up with walking.  They would not go on as many vacations although they had recently gone to Las Vegas.  Felicia stated that Gonzales struggled but he tried hard to keep up.  He did not dance as he had before.  Walking appeared to be his primary problem.  Felicia stated Gonzales used crutches and a brace/splint. [AR 158.] The crutches were prescribed after both knee surgeries.  His arm strength was good but his legs had slowed him down. [AR 160.]

An x-ray of his knees was taken on July 11, 2008.  The report indicated severe degenerative disease, "greatest involvement of the medial joint compartments bilaterally.  Probable small joint

---

[17]Gonzales's allegations concerning hand problems vary between his right and left hand.  It is not clear if both hands were bothering him, or if his allegations concerned primarily one hand.

effusions bilaterally.  No acute bone finding."  "Obliteration of the medial joint compartment of left knee with near obliteration of the medial joint compartment of the right knee." [AR 188.]

On July 16, 2008, Ph.D. Richard Fink examined Gonzales in relation to his disability benefit application.  Gonzales drove himself to the appointment.  He said that he was the second oldest of twelve children.  He also described his education and work history. [AR 192.]

Gonzales stated that his DM was controlled with diet, exercise, and oral medications.  He also took medication to control his cholesterol and Ibuprofen for pain.  He noted surgeries on both knees, one in 2004 and the other in 2007.  He had been getting synvisc injections in the knees but was not sure if they helped him.  He complained of problems with both shoulders, especially the left shoulder and numbness in his left hand if he worked on a keyboard for long.  He reported having been knocked out 2 to 3 times while playing sports in high school.  Gonzales kept busy taking care of his property.  He had a large house that he built many years ago with an acre of land.  He had a summer home or small ranch up in the mountains outside of town.  He had some animals up at his ranch.

Gonzales reported having some trouble with his memory and remembering to take his medications.  He sometimes forgot where he was going and left on the irrigation water.  He had trouble remembering peoples' names.  The examining psychologist described him as a "bit overweight" and cooperative.  However, he was not always "particularly forthcoming and sometimes had trouble putting thoughts into words."  Gonzales showed some minor short term memory problems and made some errors when using his left hand, but self corrected.  He appeared to put in good effort with WAIS-III testing but had some problems with a few tasks. [AR 193.] His IQ was lower than what would have been expected but he did not clearly show any signs of organic brain damage or dysfunction.  He generally was free from any serious cognitive or psychological

problems.   Gonzales could understand and remember detailed and complex instructions and appeared to be within normal limits.  His sustained concentration and task persistence were all right. His social interactions were all right and he was able to adapt to changes. [AR 194.]

Dr. Chiang filled out a psychiatric review technique form, dated July 22, 2008.  She found no disorders and no mental limitations. [AR 195.]

On August 2, 2008, Dr. Martin Trujillo performed a physical consultative examination. [AR 210.] Gonzales reported a 5-10 year history of bilateral knee pain secondary to arthritis.  He had arthroscopic repair of the left medial meniscus with debridement in 2004 and then the same procedure on his right knee in July 2007.  His orthopedic specialist purportedly told Gonzales that there was "bone-on-bone pathology" although there is no corresponding medical record.  Dr. Trujillo noted there were no x-rays to review on this date, a Monday, although there was an x-ray taken of Gonzales' knees on the preceding Friday.  Dr. Trujillo had three progress notes in 2008, documenting injections into Gonzales's right knee.  He complained of stiffness in the morning, and pain in the evening and pain with walking. [AR 210.]  Gonzales had been diagnosed with DM about 6 years earlier.  He had a "negative eye exam" about 1 to 2 years ago but complained of vision problems since the age of 10.  Cataracts were removed from both eyes in 2004.  Gonzales monitored his glucose levels and was "in control apparently with a recent normal hemoglobin A1c."  He also had ear canal surgery at age 21 and decreased hearing on that side.  He described "vague memory loss."  Gonzales told Dr. Trujillo that he had worked for the State of New Mexico for 27 years and then had "retired." [AR 210.] He currently worked when the State legislature was in session.

On exam, Gonzales weighed 236 pounds and was 5 feet, 10 inches tall. [AR 30.]  Both eyes were corrected, with glasses, to 20/20 vision.  He was described as "an overweight alert male with slight shuffling gait."  His right ear canal was impacted and Dr. Trujillo estimated he had 80% of

normal spoken voice hearing on that side.  Gonzales had full range of motion in his extremities and spine.  He had varus deviation of his knees; his right knee had "laxity of lateral McMurray test and laxity of anterior cruciate ligament (ACL) as by drawer test."  He had moderate to significant synovial thickening of the knees but could squat to 50% of full.  His grip and general strength were good.  His straight leg raises were negative.  There were no significant motor or sensory deficits of the upper or lower extremities.  All other testing was negative.  Dr. Trujillo's impression was degenerative joint disease, specific to both knees [AR 211], DM, with history of cataract surgery, normal mental exam, impacted right ear canal, and basic metabolic syndrome. [AR 212.] Dr. Trujillo opined that Gonzales could perform light to moderate duty work but was possibly a candidate for knee replacement surgery. [AR 212.]

On August 14, 2008, Gonzales's initial application for DIB was denied.  The primary diagnosis on this form was noted as degenerative joint disease in both knees; secondary diagnoses were obesity and hyperalimentation. [AR 47.]

On August 14, 2008, Dr. Kando filled out a physical RFC assessment.  The diagnoses were as stated above. [AR 213.] Dr. Kando found that Gonzales was limited to occasional lifting of 20 pounds, frequent lifting of 10 pounds.  He could stand or walk for at least 2 hours and sit for about 6 hours.  His ability to push and pull in his lower extremities was limited. [AR 214.] Dr. Kando noted that Gonzales had stopped working because his legislative job ended.  There was no evidence of diabetic neuropathy/retinonpathy.  Dr. Kando noted Gonzales's activities including his ability to drive and attend sporting events.  He could perform light yard work and feed and groom his pets.  Gonzalez's abilities to stand and walk were limited to 4 hours a day, and he had occasional postural limitations as to climbing, balancing, stooping, kneeling, crouching, and crawling. [AR 215.] There were no visual or manipulative limitations. [AR 216.]

15

On August 20, 2008, Gonzales filled out a disability report-appeal.  There were no changes from the last report.  He was taking about the same medications as before.  When he showered, he had some problems balancing because of his knees.  The bottoms of his feet were painful. [AR 161-65.]

Gonzales saw his primary care physician several times in late 2008 for routine lab work and a routine EKG. [AR 231, 233.] His lab results indicated slight anemia.  He was described as "big and obese" at 222 pounds.  His DM was noted as "good control."  Gonzales was advised to increase his exercise.  Dr. Berkowitz prescribed Lortab for severe knee pain. [AR 230.] On October 23, 2008, Gonzales's right ear canal was cleaned.  Gonzales had an episode of epigastric pain.  Dr. Berkowitz ordered an upper and lower endoscopy.  There were no signs of ulcers or cancer after the upper endoscopy. [AR 223-24.] He had a polyp removed during the colonoscopy and had diverticulosis in his colon. [AR 225.] The pathology on the polyp was normal/negative. [AR 227.] On November 5, 2008, Gonzales was seen by the physician's assistant at the orthopedic center.  He was having injections again in his left knee.  While there was mild swelling noted in his left knee, Gonzales thought the swelling was due to his having "overdone it." [AR 247.]

On December 4, 2008, Gonzales's request for reconsideration was denied. [AR 56.] He appealed on December 16, 2008. [AR 168.] Gonzales reported that his left knee was in constant pain and that he had difficulty walking after his injection in November 2008. [AR 169.] He did not have new problems.  He listed three medications he was taking for DM.  He had some difficulty standing and walking and needed help with cooking.  He used a walking stick, although there are no notations in the medical records that he was prescribed an assistive device. [AR 168-72.]

### *2009 Records*

In early 2009, Gonzales saw Dr. Weiner on repeated occasions for Hyalgan[18] injections into his left knee. [AR 246, 261, 268-270.] On April 29, 2009, Gonzales began receiving series of Hyalgan injections into his right knee. [AR 262-267.] On April 30, 2009, Gonzales reported to Dr Weiner that he had right hand pain since doing "post hole digging" just over one week ago.  He suffered from substantial pain and felt some grinding and catching in his hand when he made a fist. He had not encountered problems like this in the past.  On exam, some popping was heard, but there was full motion.  There was generalized tenderness in the "MP joints."  The x-ray indicated no significant abnormalities.  The impression was overuse injury of the right hand. [AR 266.]

There are no additional 2009 medical records until November 2009, when Gonzales was seen at Adobe Family Practice in Santa Fe.  The Adobe medical records are somewhat difficult to read and it is not clear what medical provider saw Gonzales.  However, these records also indicate Gonzales was retired from the State.  The Adobe records document continued treatment sessions of "Microvas[19] x 45 min." [AR 279-284.]

An Adobe medical record, dated November 30, 2009, discusses follow-up conversations about laboratory results.  A prescription for Januvia is discussed, in relation to diabetes. [AR 278.]

---

[18]"Hyalgan is one of the hyaluronates used in viscosupplementation.  Hyalgan is injected directly into the knee joint to restore the cushioning and lubricating properties of normal joint fluid.  Hyalgan is used to relieve knee pain due to osteoarthritis, for those who failed to respond to simple painkillers, exercise or physical therapy."  http://arthritis.about.com/od/hyalgan/g/hyalgan.htm (7/20/2012).

[19]"The company describes MVT [microvas] as a 'FDA 510-K registered, non-invasive vascular treatment device that delivers electromagnetic energy to targeted areas within the human body.' MVT's electronic impulses stimulate circulation in the capillaries, tiny blood vessels closer to the skin surface, which in turn increases the flow of healing oxygen to nerves and muscles that have been damaged." http://www.ehow.com/about_5657868_microvas-therapy-treat-peripheral-neuropathy.html (7/20/2012).

Throughout December 2009, Gonzales had appointments at Adobe and was treated with Microvas. [AR 272-277.]

### *2010 Records*

Gonzales's attorney wrote a letter to the ALJ on January 5, 2010 (although the letter apparently contains a typographical error as to the year). Counsel argued that Gonzales should be found disabled at step five of the sequential evaluation based on his inability to perform his past relevant work or any work in the national economy. [AR 175-76.] The letter specifically alleges severe physical impairments, including "severe limitation of use of his right hand . . . ." [AR 176.]

There is an undated list of medications indicating Gonzales was taking several medications for DM, Lisinopril for high blood pressure, Darvocet for knee pain, a small amount of thyroid for low thyroid, and Simvastatin for his cholesterol. [AR 179.] According to a disability form, Dr. Walantas at Adobe Family Care prescribed the medications. [AR 179.]

On January 26, 2010, the ALJ in Texas conducted the video hearing. Gonzales, with counsel, were present in Santa Fe. [AR 25-46.] Gonzales testified that he could not work due to his knees and problems standing, sitting and walking, along with his DM. Stress caused problems for Gonzales. [AR 32.] Gonzales stated he did not understand the ALJ's use of the term "cognitive," and then testified he had a small problem with understanding due to his DM and stress.

Gonzales described his daily activities which were similar to those described in function reports. He fed the animals, prepared breakfast for himself, cleaned up around the kitchen, and took a nap in the afternoon if he did not have a medical appointment. He had a dog, as well as two horses for 18 years. [AR 32-33.] He did not ride horses as much as he liked, but tried to ride "once in awhile." Gonzales was able to do yard work and had flower and vegetable gardens he tended. [AR 34.] He could walk 30 yards, but started to limp with pain after walking 50 yards. He described his

left knee as being worse than his right knee, but he also suffered pain and soreness in the right knee. The synvisc injections helped for awhile but did not resolve all of his pain. [AR 35.]

Gonzales was able to drive and until three months before the hearing, drove vehicles with manual transmissions.  However, he no longer could drive a car with a standard transmission because of his knee. [AR 35-36.]

Gonzales described his job with the New Mexico state legislature as part-time, seasonal work. [AR 36.] He started that job in January 2005 and worked through January 2008. [AR 37.] He also worked during some special sessions.  He had not worked full time since he was director of finance at the Department of Transportation. [AR 37.]

In January 2010, Gonzales started taking Insulin, although it is not clear that corresponding medical provider records document this prescription. [AR 37.] He also started Microvas therapy which he described as electronic impulses to help stimulate the flow of blood and oxygen into his knee.  He complained of neuropathy in his right hand.  When he grabbed an object, it was painful in his right hand.  These problems began in April 2009. [AR 38-39.]

Gonzales recently started taking blood pressure medication (as of January 14, 2010). [AR 40.] Again, other than an undated list of medications from Adobe, the medical records are not clear as to when this medication was prescribed or what Gonzales's blood pressure readings were.

Gonzales testified that if he walked, his left leg began to stiffen in the knee joint.  He suffered pain and numbness and had to sit down. [AR 40.] He could probably sit for 30 minutes before he had to stand. [AR 41.]

The VE testified from Texas. [AR 42.] She stated that a senior analyst position would be sedentary with an SVP (standard vocational preparation) of 3.  The ALJ provided a hypothetical to the VE, where the individual could occasionally lift or carry 20 pounds, frequently lift or carry 10

pounds, stand and walk at least 2 to 4 hours in an 8-hour day, sit about six hours with alternating between sitting or standing as needed to relieve pain.  The individual would be limited in his ability to push and pull with respect to the lower extremities.  There were frequent right arm manipulative limitations.  He would be able to sustain work mentally at the detailed, complex work level. [AR 43.]

The VE testified that this individual could perform the past work of the senior analyst as Gonzales performed the job at the legislature and that he could perform the highway department position as it is generally performed. [AR 43-44.]

Gonzales's attorney asked if the VE's testimony would change assuming the person were limited to sedentary work and was unable to use the right dominant hand for handling, fingering and fine manipulation. [AR 44.] The VE believed the inability to use the right hand would affect his ability to perform the tasks required in most jobs in terms of financial accounting unless the person learned to use the left hand. [AR 44.]

Counsel argued that the ALJ should find Gonzales credible because "he has a very strong earnings' record [that] indicates [] he has always been motivated to perform substantial gainful activity. . . ."  "I would also submit that if he were not continuing to suffer as a result of the diabetes, the knee problems, and the issue of neuropathy with his hand, he would continue to be working during the legislature . . . ." [AR 45.]

On February 22, 2010, the ALJ issued an unfavorable decision. [AR 10-21.] On November 7, 2011, the Appeals Council denied the request for review after consideration of his attorney's letter. [AR 1-6.]

VI.   **DISCUSSION**

A.   Alleged Legal Errors

Gonzales alleges that the ALJ erred at step three in relation to his analysis of whether Gonzales's knee condition met a listing. [Doc. 16, at 13-14.] Second, Gonzales contends that the ALJ's step four findings were erroneous in a number of ways. [Doc. 16, at 14-26.]

B.   Analysis

**STEP THREE FINDINGS**

In Murdock v. Astrue, 458 F. App'x 702, 703-04 (10th Cir. Jan. 13, 2012) (unpublished), the Tenth Circuit addressed a similar argument that the ALJ committed reversible error by not discussing the evidence or reasons why the claimant's knee condition did not meet or equal Listing 1.02.  The Court explained:

> In Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir.1996), we reversed a decision denying disability benefits because the ALJ "did not discuss the evidence or his reasons for determining that [the claimant] was not disabled at step three," but instead "merely stated a summary conclusion that the claimant's impairments did not meet or equal any Listed Impairment." We explained that "[i]n the absence of ALJ findings supported by specific weighing of the evidence, we cannot assess whether relevant evidence adequately supports the ALJ's conclusion that [the claimant's] impairments did not meet or equal a Listed Impairment, and whether he applied the correct legal standards to arrive at that conclusion." Id. We therefore remanded "for the ALJ to set out his specific findings and his reasons for accepting or rejecting evidence at step three." Id. at 1010.

Id. at 703.  The Court concluded that the ALJ erred by failing to discuss the evidence or make findings as to why the claimant's knee condition did not meet the listing.  Id.

However, while the Court concluded the ALJ committed error at step three and ultimately remanded, it further observed that such error can be harmless.

21

> A step three error, such as the one in this case, does not automatically require remand. Instead, we must consider whether "confirmed or unchallenged findings made elsewhere in the ALJ's decision confirm the step three determination under review." Fischer–Ross v. Barnhart, 431 F.3d 729, 734 (10th Cir.2005). If such findings "conclusively preclude Claimant's qualification under the listings at step three" such that "no reasonable factfinder could conclude otherwise," then any step three error is harmless. Id. at 735. If, however, there are no findings that "conclusively negate the possibility" that a claimant can meet a relevant listing, see id., we must remand to the ALJ for further findings, see Clifton, 79 F.3d at 1009–10.

Id. at 703-04.

In the present case, the ALJ did not expressly discuss the evidence or make findings at step three as to why Gonzalez's knee condition did not meet a pertinent listing. The ALJ generally found that Gonzales's conditions did not meet a listing. [AR 16.] He further stated:

> . . . [Gonzales's] condition does not satisfy that standard, even considering the combined impact of his impairments. In making this determination, I specifically considered the listed impairments relating to musculoskeletal and endocrine disorders. My finding is supported by the opinions of the medical consultants who reviewed the evidence at the initial and reconsideration levels on the current application and who determined that the claimant's combination of impairments did not meet or equal any listed impairment in Appendix 1. In this case, the opinions are well supported and consistent with the medical evidence, and they warrant substantial weight.

Because the ALJ did not discuss the evidence or making specific findings as Gonzales's knee condition and the relevant listing, this was error. However, the question is whether the error is harmless, based on the ALJ's subsequent RFC findings, as argued by the Commissioner. [Doc. 17, at 5.]

At step four, the ALJ determined that Gonzales could stand or walk for at least 2 to 4 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour work day, periodically sitting and standing to relieve pain or discomfort. [AR 16.] The ALJ observed that Gonzales reported a 5 to 10

22

year history of bilateral knee pain secondary to arthritis, and that he underwent arthroscopic surgeries on each knee in 2004 and 2007. [AR 17.] The medical records after the knee surgery indicated Gonzales was "doing well," active in physical therapy, and that his right knee was stable with full flexion and extension. [AR 17.]

In analyzing the extent of Gonzales's knee problems, the ALJ discussed Dr. Trujillo's consultative examination in August 2008. At that time, Gonzales complained of morning stiffness, evening pain, and pain with walking, especially up stairs. [AR 17.] On examination, Dr. Trujillo observed Gonzales's knee curved outward and that he had a partial ligament tear in his right knee, but that he also had full range of motion in his extremities and could squat up to 50% of full. While Dr. Trujillo opined that Gonzales might be a candidate for knee replacement, he also concluded, as noted by the ALJ, that Gonzales was capable of performing light to moderate duty work. The ALJ further found that the record indicated Gonzales had only undergone conservative treatment of his knees since his knee procedures. [AR 17.]

In reaching credibility determinations as to his pain and limitations, the ALJ considered a number of factors, including the following: that he lived in a two-story house with sleeping quarters on the first floor; he weighed over 200 pounds; he did not need a cane or walker to ambulate; he stopped working as a legislative analyst due to sitting, standing and walking limitations related to stiffness in his legs; he cared for a dog and two horses; he prepared meals and cleaned the kitchen; he rode horses on occasion; he performed yard work and tended a vegetable garden; he drove a standard-transmission motor vehicle until about three months before the January 2010 ALJ hearing; he could walk 30-50 yards limited to knee pain and stiffness; his left leg stiffened and caused pain after sitting for about 30 minutes, at which time he needed to stand; he was capable of lifting 15 to 20 pounds; he had no difficulties with his personal care; he could feed, water and groom his horses;

he could perform light housekeeping, including making the bed, washing dishes and household repairs; he could shop for groceries; he could attend sporting events and social gatherings; he could hunt; he could vacation in Las Vegas; he could assist his wife with the care of her ill family member; and as of April 2009, he was able to dig post holes.  [AR 18-19.]

Based on Gonzales's description of his daily life activities and limitations, the ALJ concluded that he could work at a light exertional level.  The ALJ further found that Gonzales "downplayed his daily activities at the hearing." [AR 19.] The ALJ noted Gonzales's obesity but stated that it was no longer a factor and did not substantially impair his daily activities.  Moreover, Gonzales, at least as of December 2008, did not report taking any prescription or non-prescription pain medication. [AR 19.]

In determining that Gonzales could perform light work, the ALJ also relied on the state agency medical consultants' opinions [AR 16, 19], who did not find that Gonzales's knee conditions met or equaled a listing.  Indeed, Dr. Trujillo noted Gonzales could perform light to moderate duty work. [AR 16, 212.] Moreover, as relied upon by the ALJ [AR 16], Dr. Kando found Gonzales could stand or walk two hours a day and sit for about six hours a day. [AR 214.] The consulting physicians noted the "slight shuffling gait, but found only occasional postural limitations. [AR 215.]

The listing on which Gonzales relies is 1.02 - major dysfunction of a joint(s) (due to any cause).  Listing 1.02 requires:

> (1) "gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability)"; (2) "chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s)" and (3) "findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction or ankylosis of the affected joints(s)" with "[i]nvolvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Part 404, Subpt. P, App. 1 § 1.02 (italics omitted).

Murdock, 458 F. App'x at 704.  The Tenth Circuit referred to the pertinent regulations explaining that "[t]o ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." Id. (citing 20 C.F.R. Part 404, Subpt. P. App. 1 § 1.00(2)(b)(2)).

To meet or equal a listing, the impairment must "meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Wright v. Astrue, 2010 WL 5466632, at *5 (W.D.Okla., Sept. 29, 2010) (unpublished) (citing Baldwin v. Barnhart, No. 02–5117, 167 F. App'x 49, 52 (10th Cir. Feb. 14, 2006) (internal alteration omitted) (quoting Sullivan v. Zebley, 493 U.S. 521, 530 (1990)). The claimant bears the "step three burden to present evidence establishing [his] impairments meet or equal listed impairments." Fischer–Ross, 431 F.3d at 733.

Stated differently, Gonzales "has the burden of demonstrating through medical evidence that his/her impairments ***meet all of the specified criteria contained in a particular listing***." Perry v. Astrue, No. 10-1006-SAC, 2010 WL 5392274, at *2 (D. Kan. Dec. 21, 2010) (unpublished) (emphasis added and citation omitted).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Id. (citation omitted).  Listed impairments, because they cut off further inquiry, are not to be read expansively.  Id. (citation omitted).

Here, Gonzales did not present medical evidence sufficient to demonstrate his knee impairment met or equaled listing 1.02.  For example, there is no evidence of a "gross anatomical deformity" of his knees, nor did Gonzales produce medical records or testing indicating "subluxation, contracture, bony or fibrous ankylosis, [or] instability" of the knees.  As noted by the ALJ, the consultative physician merely observed that Gonzales's knees curved outward. [AR 17.] The medical records indicated "slight varus deformity," *i.e.,* that he was bowlegged.

To the extent that Gonzales relies on the radiologist's report from July 11, 2008, indicating severe degenerative disease, "probable small joint effusions," and "obliteration of the medial joint compartment of left knee, with near obliteration of the medial joint compartment of right knee," the ALJ properly discounted this report. [AR 19, 188.] The ALJ noted that the radiologist was not a treating physician and that his opinion was based only on an imaging study.  Moreover, the ALJ explained that Gonzales's statements and testimony about his daily activities contradicted a finding that his knee problems were as severe as alleged.  In addition, while Gonzales had undergone arthroscopic surgeries to each knee, he subsequently obtained only conservative treatment. [AR 19.] Finally, it is unclear if a non-treating radiologist's report alone could adequately demonstrate a "gross anatomical deformity" of the knees.

With respect to the second requirement of listing 1.02, Gonzales testified as to stiffness and pain in the knees and he complained of morning stiffness to Dr. Trujillo.  However, a claimant's "descriptions, alone, are not enough to establish a physical . . . impairment under Listing § 1.02." Baldwin, 167 F. App'x at 52 (quoting Bernal v. Bowen, 851 F.2d 297, 300 (10th Cir. 1988)).  The medical evidence, while perhaps somewhat consistent with such complaints, did not conclusively show "stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s)," especially in view of Gonzales's extensive daily activities, as recounted by the ALJ.  Moreover, the ALJ's RFC acknowledges some of these problems by restricting Gonzales's ability to walk to 2 to 4 hours and allowing him to alternate between sitting and standing to relieve pain or discomfort. [AR 16.]

Finally, in contrast to Gonzales's position that he supplied evidence (primarily his own testimony or that of his wife) showing he could not "effectively ambulate" in accordance with requirements of the listing [Doc. 18, at 3-4], that evidence falls short of the regulatory requirements.

Section 1.00B(2)(b)(1) provides that an "inability to ambulate effectively" means "an extreme limitation of the ability to walk; *i.e.,* an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." The regulation further provides that "[i]neffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. Part 404, Subpt. P. App. 1 § 1.00B(2)(b)(1).

Gonzales did not present evidence that he was prescribed canes or crutches, except for the inference that he might have used assistive devices for a short time after his knee procedures in 2004 and 2007. The ALJ observed that Gonzales did not require a cane or walker to ambulate. [AR 18.] Moreover, Gonzales's activities, as listed by the ALJ, do not demonstrate "extreme" limitations on his ability to ambulate or impairments that "very seriously" interfere with his ability "to initiate, sustain, or complete activities." Gonzales was capable of driving a standard transmission vehicle for about two years after the onset date of his alleged disability, he could dig post holes, ride horses, groom and feed horses, go hunting on occasions, tend to a vegetable garden, assist with the care of an ill family member, and take vacations that involved walking. Many of these activities are somewhat rigorous. Such activities are inconsistent with a showing that Gonzales was unable to ambulate effectively.

Gonzales also argues that the ALJ erred in relying on consultative physicians' findings and by not providing necessary medical expert opinion to determine whether Gonzales's knee impairments met a listing. [Doc. 18, at 5.] Gonzales summarily argues that Dr. Trujillo's consultative examination was "flawed." [Doc. 18, at 4.] However, Gonzales was seen regularly by an orthopedic specialist and a treating physician, neither of whom opined that Gonzales's condition

met a listing.  Gonzales bears the burden of demonstrating that he met the requirements for a listing at step three.  *See* Riddle v. Halter, No. 00-7043, 10 F. App'x 665, 667 (10th Cir. Mar. 22, 2001) (unpublished) (claimant "has the burden at step three of demonstrating, through medical evidence, that his impairments 'meet all of the specified medical criteria' contained in a particular listing.") (*quoting* Sullivan v. Zebley, 493 U.S. 521, 530 (1990)).  Gonzales failed to satisfy his burden at step three.

The Court concludes, therefore, that any error committed by the ALJ at step three, was harmless.  Moreover, substantial evidence supports the ALJ's findings that Gonzales's serious impairments did not meet a listing.

## STEP FOUR RFC FINDINGS

Step four of the sequential evaluation process consists of three phases and requires the ALJ to (1) evaluate the claimant's physical and mental capacity (RFC); (2) determine the physical and mental demands of the claimant's past relevant work; and (3) decide whether the claimant has the ability to meet these job demands despite the mental or physical limitations found in phase one. Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (citations and internal quotation marks omitted); Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir.1996).  At each of these three phases, the ALJ must make specific findings.  Id.

During the step four analysis, the ALJ may rely on information provided by a VE, but the "ALJ himself must make the required findings on the record, including his own evaluation of the claimant's ability to perform her past relevant work." Winfrey, 92 F.3d at 1023.  While the claimant bears the burden of proof at step four, the ALJ has the duty of inquiry and factual development. Henrie v. U.S. Dept. of Health and Human Servs., 13 F.3d 359, 361 (10th Cir. 1993).  Stated differently, the Commissioner's basic obligation is to "fully investigate the physical and mental

28

demands of a claimant's past work and compare them to current capabilities." Hayden v. Barnhart, 374 F.3d 986, 991 (10th Cir. 2004) (*per curiam*).

      SSR 96-8p provides further instructions as to the RFC assessment, which must –

> "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations)." The ALJ must explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted.

Perry, 2010 WL 5392274, at * 4 (*citing* SSR 96-8p, 1996 WL 374184 (July 2, 1996)).

      Gonzales sets forth a number of challenges to the ALJ's step four findings. The Court discusses each below.

### ALLEGED STEP FOUR ERRORS

### (1)    RFC Phase One:

      Gonzales argues that the ALJ's findings that he frequently could lift or carry 10 pounds and frequently climb stairs and ramps were inconsistent with a finding that he could only stand or walk 2 to 4 hours per day. Gonzales claims that the term "frequently" is defined as "up to 2/3 of the work day, or 5.3 hours." [Doc. 16, at 16.] In support of that proposition, Gonzales cites SSR 96-9p. Gonzales further asserts that an individual who cannot stand and walk for more than 4 hours a day is incapable of lifting and carrying, or climbing stairs and ramps, for 5.3 hours per day. [Id.]

      The Court examined SSR 96-9p for a definition of the term "frequently," but did not locate the term in that ruling. In SSR 83-10, the term "frequent" is defined as occurring "from one-third to two-thirds of the time." Similarly, in many DOT definitions, the term is defined as an "activity or condition exists from 1/3 to 2/3 of the time." *See, e.g.,* DOT 189.167-030 ("program manager").

*See also* <u>Paliotto v. Astrue</u>, 2012 WL 845957, at *3 (C.D. Cal. Mar. 12, 2012) (unpublished) (discussing same definition for frequently in reference to sales representative or sales manager); <u>Key v. Social Sec. Admin.</u>, 2012 WL 266937, at *12 n.2 (M.D. Tenn., Jan. 11, 2012) (unpublished) ("The Administration defines 'frequent' lifting or carrying as occurring from 1/3 to 2/3 of the workday.")

The Court finds no inconsistencies in the RFC as argued by Gonzales.  Moreover, the Court rejects Gonzales's position that the ALJ erred by not specifying the frequency of the need to alternate his position, or the length of time he needed to stand. [Doc. 16, at 16.] In <u>Robertson v. Barnhart</u>, 2003 WL 21254771, at *4 (D. Kan. May 28, 2003) (unpublished), the plaintiff made a similar argument that was unsuccessful.  Like Gonzales, Robertson maintained the ALJ violated SSR 96-9p by failing to determine how frequently he would need to alternate between sitting and standing.  The Court concluded that the requirement was satisfied in that case because the ALJ's RFC assessment and hypothetical question to the vocational expert contemplated that the "plaintiff required the option to stand or sit during the work day as often as needed to alleviate discomfort. Stated another way, it is clear that the ALJ contemplated that plaintiff would need a job that permitted him to alternate between sitting and standing at will."  The same is true here.  The ALJ contemplated in his RFC assessment and hypothetical question to the VE that Gonzales would have the option to alternate between sitting and standing to relieve pain or discomfort as needed. [AR 16.]

The Court, in <u>Robertson</u>, found no error on this point, and the Court, here, finds its reasoning persuasive.  There was no error.

(2)   **Radiologist's Report**

Dr. Beagle, a radiologist, supplied a single one-page report from July 2008, in which he found "severe degenerative disease involving both knees," and "[p]robable small suprapatellar joint effusions, left greater than right." [AR 188.] The remainder of his findings are:

> There is obliteration of the medial joint compartment of the left knee with near obliteration of the medial joint compartment of the right knee.
>
> Prominent subchondral sclerosis and cyst formation with probable osteochondral defect at the medial femoral condylar articular surface. Associated mild widening of the lateral joint compartments. Mild lateral subluxation of the left tibia in relationship to the femur. No evidence of an acute bony finding.

Dr. Beagle's reported "impression" contains parts of the above findings. [AR 188.]

The ALJ noted Dr. Beagle's opinion that Gonzales had severe degenerative disease, and the ALJ concurred with a finding that Gonzales's knee problems represented a "severe" impairment within the meaning of the SSA. [AR 19.] However, the ALJ further observed that Gonzales's statements and activities, as discussed above, contradicted findings of "substantial limitations." Moreover, the ALJ noted that after arthroscopic surgeries to his knees, Gonzales had elected only conservative treatment. The ALJ also explained:

> I [] note that Dr. Beagle is not a treating physician, and his opinion was based only on an imaging study. For these reasons, I find that Dr. Beagle's opinion warrants very limited probative value in this matter.

[AR 19.]

Gonzales argues that the ALJ committed error in presuming that the radiologist was opining about functional ability, when he, in fact, was assessing only the severity of the x-ray findings, which were objective medical findings that supported Gonzales's allegations. [Doc. 16, at 17.]

31

Gonzales claims that the ALJ "essentially [and erroneously] applied his credibility finding (AR 19) to discredit objective medical findings."  He further asserts that no other physician reviewed or commented on the x-ray images and that no evidence contradicts Dr. Beagles's x-ray report.

It is perhaps notable that neither of Gonzales's treating physicians ordered or commented on the July 2008 x-ray report.  It appears to have been ordered by disability consultative physician, David Green. [AR 188.] Contrary to Gonzales's assertion that no other physician reviewed or commented the x-ray findings, Dr. Kando, a consultative physician did discuss the July 2008 x-ray, along with other medical records, but still did not find significant limitations. [AR 213-216.]

In any event, the Court finds no error in the weight assigned to Dr. Beagle's radiology report. While the ALJ must evaluate every medical opinion in the record, the weight given to each opinion varies according to the relationship between the claimant and the medical professional.  Perry, 2010 WL 5392274, at *5.  When an ALJ rejects a treating physician's opinion, he must articulate "specific, legitimate reasons for his decision."  Id. (emphasis added) (citing Hamlin, 365 F.3d at 1215).

Here, even though Dr. Beagle was not a treating physician, the ALJ explained why he gave Dr. Beagle's radiology findings little probative value.  Dr. Beagle never examined Gonzales and most likely, never saw Gonzales.  There was little to no relationship between Gonzales and the radiologist who read one or two views of x-rays.  Moreover, the radiologist did not set forth any limitations based on his interpretations of the x-ray.  To the extent that the radiologist's findings of "severe degenerative disease" of the knees constitutes a diagnosis, the mere diagnosis of an impairment is not sufficient to sustain a finding of disability.  Bernal, 851 F.2d at 301.  Indeed, the radiologist's opinion, to the extent it could be considered an opinion, would not outweigh the consultative physician's examination of Gonzales and his opinion that Gonzales could perform light

to moderate duty work, especially when Dr. Trujillo examined Gonzales only a month after the x-ray. [AR 210-12.] For the Court to decide otherwise would amount to improper reweighing of the evidence.  *See* Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005) (court cannot reweigh evidence and substitute its opinion for that of the Commissioner).

In addition, the Court notes that it is still Gonzales's burden to demonstrate he was unable to perform his past relevant work ast step four.  *See* Williams, 844 F.2d at 750-52 (setting out process).  Even if the ALJ somehow committed error in discounting the radiologist's report, Gonzales did not demonstrate how Dr. Beagle's one-page report conflicts with the RFC finding or any other finding in the case.  For example, the ALJ determined at step two that Gonzales had a severe impairment of degenerative joint disease of the knees. [AR 15.] Dr. Trujillo, on whose opinion the ALJ relied, found degenerative joint disease of both knees. [AR 211.]  Nor does Gonzales's argument convince the Court that the ALJ's decision was not based on substantial evidence due to the ALJ's treatment of the radiologist's report.  For these reasons, the Court determines any error was harmless and that the ALJ's decision at step four was supported by substantial evidence.

### (3)   Highly Relevant Evidence

Gonzales argues that the ALJ failed to consider "extremely relevant medical evidence," primarily in the form of medical records documenting various injections to Gonzales's knees and Microvas therapy treatments for his knees. [Doc. 16, at 18.] Gonzales asks that the matter be remanded for an RFC assessment that addresses all of the information concerning injections and treatments, along with the July 2008 x-ray "examination." [Id.]

First, the ALJ specifically discussed the July 2008 x-ray results as noted above.  In addition, while not discussing each of the specific treatments, including injections and Microvas, the ALJ

referred to having reviewed Exhibit 11F, pages 3-15. [AR 244-260.] That exhibit contains numerous records of Dr. Weiner's documenting injections to the knees.  Indeed, the ALJ's discussion of June or July 2007 records includes notes about injections to the knees. [AR 256, 258, 259.]

As already noted, "the record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence." Clifton, 79 F.3d at 1009–10.  Before setting forth his findings, the ALJ stated he had carefully considered the entire record. [AR 15.] This is sufficient, especially here, where the ALJ actually considered the records about which Gonzales argues.  *See* Wall, 561 F.3d at 1070 (noting well-established principle of taking ALJ at his word when he indicates he considered all of the evidence).

The Court concludes that the ALJ did not commit error and that substantial evidence supports his findings.

**(4)**     **Reliance on Medical Consultants' RFC Opinions**

The ALJ specifically relied on the state agency medical consultants' opinions with respect to his findings, including the RFC findings. [AR 17.] In addition, the ALJ thoroughly reviewed the objective medical evidence, Gonzales's treatment history, his subjective allegations and testimony, and his daily activities.

With regard to the opinions of State agency medical consultants, Social Security regulations provide that ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."  However–

> State agency medical and psychological consultants and other
> program physicians and psychologists are highly qualified physicians
> and psychologists who are also experts in Social Security disability
> evaluation. Therefore, administrative law judges must consider
> findings of State agency medical and psychological consultants or
> other program physicians or psychologists as opinion evidence,

> except for the ultimate determination about whether you are disabled
> . . . .

20 C.F.R. § 404.1527(f)(2)(1).

Gonzales argues that the ALJ improperly relied on Dr. Trujillo's "incomplete and inconsistent consultative examination," and therefore, that such opinions cannot constitute substantial evidence to support the RFC finding. [Doc. 16, at 19.] Gonzales contends that Dr. Trujillo did not have a chance to review the July 2008 x-ray report of Dr. Beagle's or the x-rays themselves. Gonzales also claims that Dr. Trujillo's opinion regarding Gonzales's ability to work is "illogical" because he "did not explain how an individual whose knee joint is so damaged that it needs to be removed and replaced reasonably can be expected to perform any type of strenuous work." [Id.] Gonzales further asserts that had Dr. Trujillo examined the x-rays or the report, his opinion might not have been that Gonzales could perform light to moderate work. Moreover, that opinion is "eroded" because of Dr. Trujillo's assessment that Gonzales *may* need knee replacement.

Defendant notes that Gonzales overlooks that Dr. Beagle himself was a consultative examiner that the state agency contracted with, on June 23, 2008, to take knee x-rays. [AR 187.] Dr. Beagle then took the x-rays on Friday, July 11, 2008. [AR 188.] Also on June 23, 2008, the state agency engaged Dr. Trujillo to perform a physical evaluation. [AR 209.] Dr. Trujillo performed that examination on Monday, July 14, 2008, the next workday after the x-rays were taken. Thus, according to Defendant, the state agency conscientiously developed the medical evidence of record, even if Dr. Trujillo did not have the results of the x-ray on the date he examined Gonzales. [Doc. 17, at 13-14.]

The Court observes that while Dr. Trujillo did not have the x-ray results, Gonzales provided a detailed subjective report of the history of his knee problems and Dr. Trujillo fully examined

35

Gonzales, with respect to his complaints. [AR 210-12.] Gonzales reported a 5 to 10 year history of bilateral knee pain, secondary to arthritis. He underwent two knee repairs in 2004 and 2007. His orthopedic specialist purportedly told Gonzales that there was "bone-on-bone knee pathology." Gonzales was receiving injections into his right knee and complained of morning stiffness, along with evening pain. [AR 210.] However, Gonzales was not taking any pain medications that he reported to Dr. Trujillo. As of August 2, 2008, he supposedly told Dr. Trujillo that he "currently works when the State legislators [sic] are in session, still working in finance." [AR 210.]

On exam, Dr. Trujillo found varus deviation of the knees and laxity of the lateral McMurray test and laxity of the ACL. He was able to squat to 50% of full. Most testing, including Romberg and tandem walk, was normal. [AR 211.] Dr. Trujillo concluded that Gonzales suffered from degenerative joint disease of both knees, but that he still could perform light to moderate duty work. [AR 211-212.] Dr. Trujillo, while only a consultative examining physician, was the only physician who stated Gonzales could be a candidate for knee replacement.

On August 14, 2008, the reviewing physician, Dr. Kando, did have the x-ray findings but still determined that Gonzales could stand or walk 2 hours a day and sit 6 hours a day. [AR 214.] Dr. Kando also found that standing and walking were limited to 4 hours per work day. [AR 215.]

The Court does not find the ALJ committed error by relying on the medical consultants' opinions, nor does it find that Dr. Trujillo's opinions, after examination, conflicted with the x-ray results that he did not have. The argument that Dr. Trujillo's findings or opinion are "significantly eroded" merely because Dr. Trujillo projected that Gonzales "may" need knee replacement surgery is unpersuasive. Moreover, many individuals have knee replacement surgeries and continue to work. Gonzales provides no support for her speculative argument that the specter of knee replacement surgery translates into such serious knee damage that Gonzales could not return to his

prior relevant work.  In addition, it is noteworthy that between Dr. Trujillo's 2008 report and the 2010 ALJ hearing, Gonzales elected to proceed with conservative treatment for his knees, which the ALJ observed in his opinion.

The Court finds no error by the ALJ and further that his step four findings were supported by substantial evidence, including the reports of the consultative physicians.

### (5)    Failure to Consider Obesity

Social Security Ruling 02-1p requires an ALJ to consider the effects of obesity when assessing RFC because "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately."  SSR 02–1p, 2000 WL 628049, at *1 (Sept. 12, 2002).  At least one district court explained that this "evaluation is particularly important when a claimant has both musculoskeletal impairments and obesity."  Calvert v. Astrue, 2011 WL 5429303, at *2 (W.D.Okla. Oct. 11, 2011).

An argument might be made that Gonzales did not allege obesity as an impairment, nor did his attorneys raise the condition in letters to the ALJ or in the ALJ hearing.  However, disability proceedings are nonadversarial, and the ALJ has a duty to make sure the record is complete.  Id. (citing Wall, 561 F.3d at 1062–1063).  Clearly, in this case, there numerous records indicating Gonzales's height and weight and that physicians described him "big and obese," even if there were not explicit diagnoses of obesity or treatment prescribed for obesity.  The records were sufficient to alert the ALJ to consider Gonzales's obesity.

And, this the ALJ did.  He stated the following:

> I note that the claimant's activities are possible even considering the combination of his impairments, including those determined not to be "severe," and I conclude that obesity is no longer a factor and does not substantially impair his daily activities (See SSR 02-1p).

[AR 19.] Gonzales takes issues with the ALJ's findings and argues that the ALJ's dismissal of obesity renders his step three and four findings erroneous. [Doc. 16, at 20.] The Court disagrees.

Similar to a number of Gonzales's unsuccessful arguments, he fails to provide evidence of how the limitations, or in this case, his obesity, imposes additional limitations beyond those found by the ALJ.  All of the consulting physicians noted Gonzales's body size and weight and yet, they still opined that he could perform light to medium work.  The ALJ explicitly addressed obesity as he must, but he found, in view of Gonzales's somewhat strenuous activities, including hunting, vacationing in Las Vegas, helping with ill family members, riding horses, working in a garden, and digging post holes, that obesity was not a factor. [AR 19.] While his findings on obesity might have been more explicit, the Court finds no error by the ALJ and furthermore that his findings were supported by substantial evidence.

### (6)   Failure to Find Functional Effects from Diabetes

At step two, the ALJ found that diabetes mellitus was one of several severe impairments. [AR 15.] In the RFC analysis, the ALJ noted that Gonzales's testimony at the ALJ hearing that he believed he had limitations from managing his diabetes "(*e.g.,* testing his blood sugar three times a day and taking appropriate medications, including insulin starting in 2010), which also causes some cognitive problems, and his diabetes is not controlled." [AR 18.]

The ALJ further observed that in contrast with Gonzales's hearing testimony, the "record shows that his diabetes has been well-controlled." [AR 17.] In so finding, the ALJ relied on medical information/records from Dr. Nickerson and Dr. Weiner.  Dr. Nickerson observed that Gonzales's treating physician Dr. Berkowitz found Gonzales's DM under good control as of October 21, 2008, despite raised glucose levels. [AR 230, 243.] Dr. Weiner's progress note, dated June 8, 2007,

indicated that Gonzales was a patient of Dr. Berkowitz and that Gonzales said his diabetes was "very well controlled." [AR 260.]

Gonzales argues generally that it is inconsistent for an ALJ to find an impairment severe (significantly limiting) at step two and impose no work-related restriction at step four. [Doc. 16, at 20.] Because the ALJ should have assessed the functional limitations resulting from DM and whether there were jobs that Gonzales could do with those limitations, Gonzales contends the case should be remanded to address the functional effects of his "poorly-controlled diabetes." [Doc. 16, at 21.]

In making this argument, Gonzales must disagree with his treating physician's opinion that his DM was under good control, at least in October 2008, and with Gonzales's own statements to physicians that his DM was very well controlled. [AR 230, 260.] With respect to Dr. Berkowitz's opinion, Gonzales argues that it is "patently contradicted by laboratory test results" that showed "elevated fasting blood glucose, elevated Hemoglobin AIC and elevated mean daily glucose levels on every occasion testing was performed. . . ." [Doc. 16, at 21.] Because of the lab results, read by counsel, Gonzales argues Dr. Berkowitz's opinions are not "well-supported by medically acceptable clinical and laboratory diagnostic techniques."  Thus, in Gonzales's opinion, the ALJ erred in adopting it.

With respect to Gonzales's own statements to doctors that his DM was controlled, he now argues that he did not learn that his DM was in poor control until January 2010.  Gonzales refers to his ALJ hearing testimony, when he stated that as of January 14, 2010, he was prescribed insulin. [AR 37.]

It appears from the record that Gonzales did not see Dr. Berkowitz after late 2008. [AR 222-241.] Nor did he see his orthopedic specialist, Dr. Weiner after May 2009. [AR 261-271.] Instead,

Gonzales began to go to Adobe Family Practice in Santa Fe in November 2009. [AR 272-284.] It is not clear from the medical records who the provider was.  The medical records themselves are sparse and difficult to read.  They mainly document a series of Microvas treatments to his knees, with no indication whether the treatments were effective.  There is no January 2010 record from Adobe indicating a change in medication to Insulin, although the ALJ referenced some record, to that effect, during the hearing.  The only record that may apply is a list of Gonzales' medications that he filled out for disability services on an unspecified date. [AR 179.] That form indicates that Dr. Walantas was the prescribing physician, and that he had prescribed Novalog three times a day for diabetes, Levenmir once a day for DM, Lisinopril once a day for high blood pressure, Darvocet twice a day for knee pain, thyroid for a thyroid condition, and Simvastatin for cholesterol.  This form lacks dates or any testing that corresponds with these prescriptions.

While Gonzales's lab results indicate that his glucose levels were elevated or "out of range," the Court agrees with Defendant's position that there is no competent evidence presented to suggest a diabetic's condition must be classified as "uncontrolled" if his glucose range is not entirely "in range."  That position is supported by Dr. Berkowitz's opinion that after laboratory testing and out-of-range glucose levels, Gonzales's diabetes was controlled. [AR 235, 238.] There are numerous notations in the record by treating physicians, consultative physicians, and Gonzales himself, indicating his DM was controlled.  No physician opined that Gonzales was impaired due to symptoms related to DM.

There was sufficient evidence to support the ALJ's RFC and step four findings with respect to Gonzales's diabetic condition.  Gonzales came forward with no evidence showing that his DM resulted in specific functional limitations beyond those assessed by the ALJ.  For these reasons, the Court concludes the ALJ committed no error and that substantial evidence supports his findings.

**(7)    Credibility Findings**

"Credibility determinations are peculiarly the province of the finder of fact," although such findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (alteration and internal quotation marks omitted).  The reviewing court does not substitute its own judgment for that of the fact finder.  Moreover, a reviewing court recognizes "that some claimants exaggerate symptoms for purposes of gaining government benefits, and that deference to the fact-finder's assessment of credibility is the general rule."  Frey v. Bowen, 816 F.2d 508, 517 (10th Cir. 1987).  In addition, Tenth Circuit precedent "does not require a formalistic factor-by-factor recitation of the evidence so long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility." Poppa v. Astrue, 569 F.3d 1167, 1171 (10th Cir. 2009) (alteration and internal quotation marks omitted).

In evaluating a claimant's credibility as to symptoms, the Commissioner considers all symptoms that can reasonably be accepted as consistent with the objective medical evidence and other evidence, reports of doctors, diagnoses, prescribed treatment, daily activities, efforts to work, and any other pertinent evidence.  20 C.F.R. § 404.1529(a).  A claimant's statements about pain or other symptoms alone does not establish disability.  Id.  In evaluating the intensity and persistency of symptoms and pain, the Commissioner considers all available evidence, including what medications have been used, how the symptoms affect a claimant's pattern of daily living, the location, duration, frequency, and intensity of pain, precipitating and aggravating factors, type, dosage, effectiveness of medications, treatment, or other measures used to relieve pain.  20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

Here, Gonzales argues that the ALJ's credibility analysis consisted of a "selective review" of Gonzales's activities.  Gonzales contends that the ALJ erred by not stating "to what extent he rejected Plaintiff's allegations." [Doc. 16, at 22.][20] Gonzales challenges the ALJ's failure to state why he rejected Gonzales's statements that he could not walk more than 100 to 150 feet, stand for more than 5-8 minutes, sit for more than 30 minute, etc.  By failing to provide such reasoning, Gonzales claims that the ALJ did not sufficiently articulate his credibility findings and spoke only in terms of generalities.  In addition, Gonzales takes issue with the ALJ's failure to discuss information provided by Gonzales's wife. [Doc. 16, at 23.]

In this case, the ALJ thoroughly discussed the medical records along with Gonzales's subjective complaints of knee problems and pain.  He also discussed Gonzales's allegations concerning right hand pain, along with the physician's examination of his hand.  The ALJ commented on treatments for Gonzales's conditions, including arthroscopic knee surgeries, physical therapy for his knees, the possibility of knee replacement, and the fact that Gonzales had undergone only conservative treatment on both knees since his knee procedures in 2004 and 2007. [AR 17.]

The ALJ then quoted extensively from Gonzales's reports of his activities throughout the day, for example, "caring for a dog and two horses, preparing meals, and cleaning the kitchen." [AR 18.] The ALJ observed that upon further questioning at the hearing, Gonzales admitted that he also rode horses on occasions, performed yard work, tended a vegetable garden and drove a standard transmission vehicle up until three months before hearing.  The ALJ considered Gonzales's

---

[20]Plaintiff's counsel apparently refers to <u>Wilson v. Astrue</u>, 602 F.3d 1136, 1144 (10th Cir. 2010) for the proposition that an ALJ must state to what extent he or she rejects a plaintiff's allegations.  That case does not stand for that proposition, although the Tenth Circuit relied on out-of-circuit cases indicating the ALJ "'must articulate specific reasons for questioning the claimant's credibility' where subjective pain testimony is critical.") <u>Id.</u> (internal citation omitted).

testimony that he could walk 30-50 yards limited by knee pain and stiffness, and that his left leg stiffened and caused pain after sitting for 30 minutes, at which point he needed to stand. [AR 18.]

With respect to Gonzales's right hand pain, the ALJ noted that he recently had been digging holes before complaining on one occasion about his hand pain. During the ALJ hearing, the ALJ observed that Gonzales could freely flex his right hand. While the evidence may not have supported a right-hand limitation, the ALJ gave Gonzales the benefit of the doubt by providing a "specific right hand manipulative limitation based primarily on his testimony at the hearing." [AR 17-18.]

The ALJ thoroughly discussed Gonzales's allegations of pain after consideration of his daily activities, the specifics of his pain, factors that precipitate or aggravate his pain, the treatments or medications he took, any other measures he undertook to relieve pain (*e.g.,* that he took no prescription or non-prescription pain medication as of December 2008), and his subjective testimony about pain and other related symptoms. Again, the ALJ observed Gonzales's testimony about the weight he could lift, and the wide range of daily activities in which he participated. The ALJ concluded that Gonzales's abilities to perform normal housework functions, along with his overall activity level, were "consistent with the demands of at least a light exertional level." Thus, the ALJ found that Gonzales "downplayed his daily activities at the hearing."

In reaching his credibility determinations, the ALJ also expressly considered Gonzales's "excellent work history." The ALJ concluded, however, that while his exertional and nonexertional capabilities were compromised, they were not compromised to the degree alleged "(i.e., an inability to work in any capacity)." [AR 19.] In so finding, the ALJ relied on the state agency medical consultants' determinations that Gonzales could perform light work but in addition, to those limitations, provided "a specific pushing and/or pulling exertional restriction in consideration of [Gonzales's] lower extremity limitations." [AR 19.] The ALJ also provided nonexertional

43

limitations consistent with "the most liberal interpretation of his impairments and symptoms, including a wide range of postural, manipulative, and environmental limitations." [AR 19-20.]

The Court finds no fault with the ALJ's extensive and reasoned credibility determinations. The ALJ closely and affirmatively linked the credibility findings to substantial evidence. Based on the thorough record review and testimony by Gonzales, the ALJ's specific findings cannot be said to be merely a conclusion in the guise of findings. They are neither a discussion of "the evidence in generalities" nor a "selective review" of Gonzales's activities.

In addition, contrary to Gonzales's position, the ALJ did consider Gonzales's wife's description of his activities. [AR 19] (*citing* Ex. 6E).] The ALJ was not required to provide a factor-by-factor recitation of the third-party report. However, if he had, the ALJ could have noted Gonzales's wife's statements that Gonzales "cannot ride horses as long as before and has to be very careful when walking." [AR 156.] Moreover, the limitations checked off by Gonzales's wife were fewer in number than those of Gonzales. For example, she did not find his lifting, reaching, sitting, understanding, or using hands limited. [AR 159.] She described her husband as needing nothing more than a knee brace on occasion if he felt he would be "bending his knees frequently," implying he could bend frequently. Moreover, the ALJ did comment on Mrs. Gonzales's statement about their recent vacation in Las Vegas and his help in caring for an ill family member. [AR 19.]

The Court finds the ALJ's credibility findings are supported by substantial evidence and that there was no error.

**(8)    Phase Two: Specific Findings as to Demands of PRW**

At the second phase of step four, the ALJ must determine the physical and mental demands of the claimant's past relevant work. <u>Winfrey</u>, 92 F.3d at 1023. Plaintiff bears the burden of demonstrating at step four that he cannot return to his past relevant work, either as he performed it

or as it is performed in the national economy.  Barker v. Astrue, 459 F. App'x 732, 741 (10th Cir.

Feb. 15, 2012) (unpublished) (*citing* Andrade v. Sec'y of Health & Human Servs., 985 F.2d 1045,

1051 (10th Cir. 1993)).

At the ALJ hearing, Gonzales testified that he worked for the legislature at the House as a

"senior analyst." [AR 31.] The ALJ asked Gonzales what he did in that role, on a "day-to-day basis."

Gonzales testified:

> I was assigned the appropriation committee and also the tax and revenue committee
> so any bills going to that committee we had to analyze them, we had to research, as
> far as info we had to go to the internet and use certain laws, books that we were
> given and analyze those bills and prepare them for those committees.

[AR 31.] Gonzales further stated that he was assigned new duties in addition to those described, *e.g.,*

he was placed in charge of capitol projects. [AR 32.]

In response to questions from the ALJ, the VE testified that Gonzales worked as a senior

analyst, that the work was skilled and sedentary and was rated at an SVP of 3.[21] [AR 42.] In so

testifying, the VE did not identify a job title/description from the DOT by number.  No one at the

hearing explore whether an SVP of 3 (*see* fn 21, *infra)* was accurate for the work that Gonzales

performed.

The ALJ presented a hypothetical to the VE, based on various physical limitations, as

discussed above, and further hypothesized that the individual would be able to sustain work mentally

---

[21]"[SVP] is defined as the amount of lapsed time required by a typical worker to learn the
techniques, acquire the information, and develop the facility needed for average performance in a specific
job-worker situation.  This training may be acquired in a school, work, military, institutional, or
vocational environment." An SVP of 3 means "over 1 month up to and including 3 months" is required to
learn the specifics, etc. of a particular job.  In contrast, for example, an SVP of 8 means "over 4 years up
to and including 10 years" is required to learn the specifics of a particular position.  DOT, Appendix C.
*See also* http:// www.oalj.dol.gov/libdot.htm, Appendix C.

at the detailed, complex level. [AR 43.] The VE testified that this person could perform the Gonzales's past work "of senior analyst as he performed it at the legislature." [AR 43.] But, the VE indicated that Gonzales had to lift more than 20 pounds on occasions in his analyst job with the highway department; thus, Gonzales would be unable to perform the highway department analyst position as he performed that job, but he could perform the transportation analyst job as it was generally performed in the economy. [AR 43-44.]

Gonzales's attorney asked the VE what transferable skills "an analyst would have." [AR 44.] The VE testified that the individual would need the knowledge and ability:

> to apply principals of accounting regarding financial operations, preparing financial reports, the ability to use and utilize computers in the delivery of such reports, to use computers to perform financial research as required, maintaining budgets, developing budgets and providing supervisory responsibilities as needed.

[AR 44.]

Counsel then asked the VE if the individual could still perform this sedentary work if he was unable to use the right dominant hand for handling, fingering and fine manipulation, and elevation of the leg above the heart at least twice a day. The VE believed that the inability to use the right hand would affect that person's ability to perform the tasks required in most jobs in terms of financial accounting. [AR 44.]

In his written decision, the ALJ found that Gonzales could still perform his past relevant work as a legislative senior analyst both as he performed the work and as the job was ordinarily performed in the national economy. The ALJ also found that Gonzales could perform the highway department senior analyst as the job was ordinarily performed in the national economy.

The ALJ also discussed the VE's hearing testimony and the fact that the VE testified that Gonzales's PRW was skilled and sedentary. The ALJ did not mention the SVP rating. The ALJ

noted his questions to the VE regarding the RFC , the limitations he found, and that the VE testified the hypothetical individual could perform the PRW as noted above.  The ALJ also stated he had considered counsel's question to the VE but found no support for her proposed limitations as to the right hand and Gonzales's alleged need to elevate his leg twice a day. [AR 20.]

In reaching his step four findings that Gonzales could return to his PRW, the ALJ also referred to Exhibits 2E [AR 127-134] and 4E [AR 136-143], reflecting Gonzales's descriptions of his prior work as analysts for the legislature and transportation department. [AR 20.] In these work history descriptions, Gonzales stated that he held the "Senior Analyst Legislature" position for the longest period of time, from 8/1977 to 12/2003. [AR 129.] He was director of financing and accounting, processed accounting for the State highway department, processed all payments to vendors, and provided status to legislature and highway commission.  He used technical knowledge and skills and completed reports.  Fifty pounds was the heaviest amount he lifted in that position; he frequently lifted less than 10 pounds. [AR 129.] He supervised 30 people, was a "lead worker," and hired and fired employees. [AR 129-30.]

In another work history report [AR 136], also referred to by the ALJ in his written decision, Gonzales described his work as a "senior analyst house majority" for the legislature as working on two committees, where he was assigned bills to analyze, assigned capitol projects, and worked with the Senate. [AR 136.] In that position, Gonzales also used equipment, employed technical knowledge, and prepared reports.  He did not have to lift or carry much weight and lifted no more than 10 pounds; he frequently lifted 1-2 pounds.  He supervised a few employees. [AR 137.]   His description, on this form, of the other position with the transportation department was similar to that described above. [AR 138.] He worked at this position from 2004 to February 2008, when the

legislature was in session.  In total, Gonzales performed analyst work from about 1977 to 2008 until his retirement, just over 30 years.

Gonzales makes a number of arguments alleging error by the ALJ at phase two of step four, including the following:  the ALJ directed only a single question to the VE about the exertional and skill requirements of his prior relevant work and failed to ask the VE about specific physical and mental demands of the PRW; the ALJ elicited only partial information from Gonzales about the specific mental demands of his duties as a legislative analyst; while Plaintiff's attorney obtained more information from the VE about the mental duties of "analyst," the VE's description did not match the DOT job description; and the VE's description of Gonzales's PRV as requiring an SVP of 3 conflicted with the DOT; and the ALJ did not reconcile conflicts between the ALJ testimony and the DOT information. [Doc. 16, at 23-24.] Ultimately, Gonzales argues that the errors in the VE's testimony concerning Gonzales's past job and SVP level renders the ALJ's step four finding unsupported by substantial evidence. [Doc. 18, at 10.]

a)  <strong>Exertional Demands</strong>

The ALJ might have elicited additional information concerning the exertional and skill requirements from the claimant or the VE during the hearing.  However, the Court concludes there was sufficient information in the record about these requirements, as set forth by Gonzales in his work history reports.  That information was supplemented in questioning, both the ALJ and claimant's counsel at the hearing.

The Court acknowledges that, at step four, the Commissioner has a "basic obligation" to investigate the physical and mental demands of a claimant's past work and compare them to his current capabilities.  Hayden v. Barnhart, 374 F.3d 986, 991 (10th Cir. 2004).  Moreover, Tenth Circuit precedent is clear that notwithstanding the claimant's burden, "if the ALJ fails to make the

requisite inquiry regarding the exertional demands of a claimant's prior work and ***the record is devoid of evidence on that issue***, a case must be remanded to develop an adequate record.  Id. However, in this case, the ALJ made the requisite inquiry regarding the exertional demands of Gonzales's prior work, and this is not a case where the record is devoid of evidence on those issues.

### b)    Mental Demands

As to the development of the record concerning Gonzales's mental abilities and mental demands of the analyst positions, the Court finds no error.  Gonzales's PRW was skilled work that required a certain level of education.  Gonzales had a college degree and capably performed the jobs for 30 years.

The Court recognizes that in Winfrey, the Tenth Circuit required that –

> [w]hen the claimant has a mental impairment, care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g., speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work.

Winfrey, 92 F.3d at 1024.  When a claimant has a mental impairment, "the ALJ must make findings regarding the physical ***and mental demands*** of the claimant's past relevant work."  Id. (emphasis added).  Here, however, the ALJ neither found mental impairments at step two, nor did he find any substantial limitations based on Gonzales's allegations of some memory loss and concentration deficits. [AR 17.]

Gonzales did not initially allege mental impairments in his DIB application.  However, because he made statements concerning alleged memory loss and concentration problems, the Commissioner directed that a consultative psychologist examine Gonzales.  In July 2008, Dr. Fink examined Gonzales, and the ALJ discussed Dr. Fink's findings, stating–

> I find no support for the claimant's statements that memory loss and concentration deficit represent substantial limitations, noting that on examination [by Dr. Fink] [Gonzales] exhibited only minor sort-term memory problems and appeared to be generally free from any serious cognitive or psychological problems; *e.g.,* his ability to understand and remember detailed or complex instructions was within normal limits, and his ability for sustained concentration and task persistence was not impaired.  In addition, his abilities for social interactions and adaptation to changes in the workplace were unimpaired.

[AR 17.] The ALJ then accepted the state agency determination that Gonzales had no mental impairments. [AR 17, 194, 195.]

The ALJ is not required to provide mental limitations in the RFC if there are none established by the record.  *See, e.g.*, Qualls v. Astrue, 428 F. App'x 841, 850–51 (10th Cir. 2011) (unpublished) (rejecting claimant's argument that the ALJ had omitted limitations in the RFC determination that resulted from nonsevere mental impairments); Dray v. Astrue, 353 F. App'x 147, 150–51 (10th Cir. 2009) (unpublished) (evidence of mild mental impairments did not contradict ALJ's RFC determination omitting any limitations related to mental impairments).

Under circumstances where the ALJ did not find any mental impairments or limitations, there is no need to inquire into the mental demands of the PRW, especially here, where the record establishes Gonzales had performed the work for 30 years.  *See* Burk v. Astrue, No. 11-5138, 2011 WL 3665347, at *4 (N.D.Okla. Aug. 22, 2011), *aff'd*, ___ F. App'x ___ (Text not yet available on Westlaw) (10th Cir. Aug. 6, 2012) (unpublished) (no need to explore mental demands of PRW because ALJ found her mental impairment did not impact her ability to work); Lenard v. Astrue, 2011 WL 5878384, at *8 (N.D.Okla. Nov. 23, 2011) (unpublished) (where the ALJ affirmatively found no severe mental impairment and no corresponding mental functional limitations, the ALJ was not required to make an inquiry of the VE regarding the mental demands of the claimant's past relevant work.).

### c)    Inconsistencies/SVP Rating

Regarding Gonzales's set of arguments concerning step four, the Court addresses the issue of inconsistencies between the VE's testimony and the SVP rating of 3 and/or the DOT descriptions of the position.  The Court observes Defendant's agreement that the VE's testimony regarding the legislative senior analyst position might not match the corresponding DOT entry.  [Doc. 17, at 21.] Defendant argues, however, that the VE's description "matches closely with the DOT entry for a senior analyst at the highway department, which the Commissioner agrees is entitled Program Manager, #189.167-030, *available at* 1991 WL 671500." [Id.] The SVP for a Program Manager is 8.  While this is a different job title, Defendant notes that the VE "understandably used Plaintiff's own phrasing in labeling the job as 'senior analyst.'" [Id. n. 2.] Defendant generally asserts that while the VE's testimony appears to conflict with the DOT to some extent, particularly in terms of the SVP, any related error was harmless.  That is true because even if the SVP for the prior relevant work is a 7 or an 8, Gonzales had already learned the job over the 30+ years he performed the positions.  Thus, it is irrelevant, according to Defendant, how much time it would require Gonzales to learn his prior relevant work.

The Court agrees with Defendant as to the VE's testimony about SVP.  While the VE provided misinformation concerning the SVP, it is a non-issue at step four and under the circumstances of this case.  Moreover, the fact that the VE failed to identify the DOT job title and number is irrelevant as well because it is clear from Gonzales's own testimony and descriptions of

his job, what his duties and requirements were.[22]  It is uncontested that the positions he performed were skilled and sedentary, at least with respect to how those jobs are performed in the national economy.  Gonzales clearly had sufficient education and experience to perform the positions or to meet the educational requirements of the pertinent positions.  This is not a case where Gonzales would need to re-learn the skills of a job he had performed for 30 years.

Thus, any error by the VE about SVP rating was harmless.  Accordingly, there were not inconsistencies that the ALJ was required to resolve.

### d)   Substantial Evidence

With respect to Gonzales's argument that errors in the VE's testimony concerning Gonzales's past job and SVP level rendered the ALJ's step four finding unsupported by substantial evidence, the Court rejects this argument.  First, the Court found only harmless error by the VE concerning the SVP level.  Second, this is not a case where the ALJ relied solely on the VE's testimony the conclusion that Gonzales could perform his PRW.  The ALJ relied on the evidence of record, as noted above, and discussed the VE's testimony as to the skill and exertional levels. [AR 20.] Moreover, the VE's role in supplying vocational information at step four is much more limited than his role at step five.  Winfrey, 92 F.3d at 1025.  While the AL may rely on information

---

[22]It appears that the "legislative analyst" position simply is not listed as such in the current version of the DOT, which was last revised in 1991, over 20 years ago.  The positions of economist (050.067-010), budget accountant (160.162-022), legislative assistant (169.167-066), and program manager (189.167.030) all may describe parts of the job requirements that Gonzales testified he performed.  And, they all require an SVP of 7 or 8.  Unfortunately, the DOT may not contain an exact match.  Indeed, the Department of Labor has replaced the DOT with the O*NET (an online updated database of job descriptions).  However, while a few district courts have referred to the O*NET in social security cases, others have observed that "there is no support for [the] assertion that the O*NET is now used by the Social Security Administration (SSA) for disability adjudication." Rodriguez v. Astrue, 2012 WL 552713, at *3 n.3 (D. Ariz. Feb. 21, 2012) (unpublished). See Strickland v. Astrue, 2011 WL 4048985, at *13 (M.D.Fla., Sept. 13, 2011) (unpublished) (" O*NET is not listed as an acceptable publication in the 2011 Code of Federal Regulations, while the DOT is still listed as an acceptable publication in determining whether certain jobs exist in the national economy.")

supplied by the VE at step four, a VE's testimony is not necessary at step four.  Musgrave v. Sullivan, 966 F.2d 1371, 1376 (10th Cir.1992).

The Court finds that the ALJ committed no error at phase two of step four and that substantial evidence supports his step four findings.

**(9)**     **Phase Three**

Gonzales argues that because the ALJ did not complete phases one or two correctly, he was unable to make the necessary phase three findings comparing Gonzales's RFC to the demands of his past relevant work. [Doc. 16, at 26.] The Court determined that the ALJ completed phases one and two correctly.  Thus, the argument fails.

C.     Conclusion

The Court concludes that the ALJ either committed no error in his analysis or that any error was harmless.  In addition, the Court finds that substantial evidence supports the ALJ's step three and four analysis.

IT IS THEREFORE ORDERED that Gonzales's motion is DENIED, with the result that Gonzales's complaint and this matter are dismissed, with prejudice.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
United States Magistrate Judge